But this case, Mada Yanez v. Bondi, will be submitted. And we've previously submitted the case of Anthony Ray Lopez v. the City of Ontario. So we will take up L.B. v. San Diego Unified School District. Who's representing Ms. Nunez, you're representing an appellant? Counsel, I can't hear you. She's not at the microphone yet. Yes, you may proceed. Good morning, Your Honors. Can you hear me, Judge Gold? Yes, now I can.  Good morning. May it please the Court. Megan Nunez on behalf of the plaintiff appellants. I'm joined by my associate, Peter Cuevas. And I'd like to reserve three minutes of my time for rebuttal, if I may. Okay. We're here today, Your Honors, because the administrative court created a brand new legal standard that was erroneously upheld by the district court. That standard held that L.B.'s parents, who placed him in a private school in a time of crisis at enormous financial hardship, and then attended six IEP meetings over a 15-month period, did not have any right to an offer of an appropriate education at any of those IEP team meetings. We are not asking that this court answer the question of whether the district... their child in a wilderness therapy camp and then placed him in an academy in North and South Carolina without the school district's knowledge. Correct? That's not correct, Your Honor. They told him after the fact that we're moving him here. This is the September 29, 2020, email. There have been some recent developments with L. You should know about. He will be going to a wilderness therapy camp starting tomorrow. Yes. So they did only give one day notice about the camp, and that's because, frankly, they were in crisis and only knew that he would be leaving around that time. But immediately thereafter, they requested... It didn't take any time to put a placement in a wilderness therapy camp in North Carolina? It was a very... And get the plane tickets and everything. They just did it. They just were surprised and shocked and did it within a day? It was a very quick turnaround process, yes. And then they moved L to Whetstone Academy in December of 2020 but didn't tell the school district until March. That's actually also not true. What happened is that when they notified the district that L.B. would be attending trails, they made it very clear. It's in the letter that they sent that trails could only last up to 90 days. And so they then attended the October 9th, 2020 IEP meeting, the November 5th, 2020... But they never said he's moved to Whetstone. The April 26th, 2021 letter that says, to whom it may concern, L.B. is currently a student at Whetstone Academy. That's the first time the district learned that he was placed at Whetstone Academy. That's actually not correct, Your Honor. Okay. Cite me to the... I have all of the emails. Tell me which of the emails tell the school district that L.B. has been placed at Whetstone Academy before ER 354. So this is not in an email, but it is very well substantiated on the record through parents' testimony and was never contradicted by anybody that at the November 13th, 2020 IEP meeting, the parents attended that meeting and they said to the IEP team, look, he's finishing at Trails. As you know, it's only a 90-day program. Unfortunately, Trails has said he is not able to return home. He's going to need a residential treatment center. They asked the district to place him in a residential treatment center. The district refused, and so the parents had no option but to place him in a residential treatment center when the wilderness program ended. When did they tell the school district that L.B. was at Whetstone Academy? They sent a discharge summary to the school district in March. So in March 2021, the parents sent the district an independent evaluation and said, here's a new evaluation of L.B. Please reconsider your decision not to fund the residential treatment center. What was included in that document? Did it say that L.B. was at Whetstone? No. The question is, when did the school district learn that L.B. was at Whetstone Academy? Very shortly thereafter. Is it the April 26, 2021 letter? No. In response to the independent evaluation email, Sue Solario, the lead teacher, sent parents a release of information to speak with Trails, which parents signed immediately. And parents sent her the discharge summary from Trails that said that L.B. had left Trails when everybody knew he would at the end of December, and that Whetstone was the recommended next placement. Let's go back. I mean, so in 2019 to 20, he was first at the Korea Middle School. And then the district created an IEP for him in December of 2019, right? Correct. You're going to assume that was a request for an IEP meeting or a request that he be given a fair and appropriate public school education? The December 2019 IEP? Yeah. But how did that come about? Yeah, so that came about because in about October of 2019, he started to demonstrate pretty severe mental health issues. So the school district decided they, I believe, decided themselves to evaluate him. And that took quite a while because he was in and out of hospitalizations. So it wasn't finalized until December of 2019. That IEP, therefore, did have quite a bit of outdated information in it because by the time it was finalized, the information had been gathered primarily in October of 2019. So it was really by the time it was offered to the parents, it was already outdated. So that resulted in the request for a due process hearing? What happened after that is that the parents attended two more IEP meetings. And there's a stipulation that those IEPs were identical to the December 2019 IEP. And the district told parents, if you would like a residential treatment center, you need to file for due process. That's what the IEP team told them. So unrepresented, they filed their own due process complaint and negotiated without an attorney with the district in, I believe it was May of 2020. Okay. And so then in August, he began attending the Riley Alternative School for Mental Health.  But then the schools were closed due to COVID, I'm going to assume? Correct. Yeah. Okay. And he had problems with the online earning, learning. And so then they notified the district that he would be attending Trails End. That's when that happened. Yes. So he did stay at Riley for a month, but his mental health needs just drastically increased. I mean, prior to that, he had been hospitalized seven times within one year. So he wasn't in a great place to begin with. But that unstructured home-based option just did not work. And I mean, the record's pretty clear. He was threatening to hurt himself, hurt his brother. He physically assaulted his mother and brother. Parents had to lock away knives. So they really were in crisis. And that's why they placed him at the Trails program. Immediately after they placed him there, they requested a formal IEP and were attempting to work with the district to develop an IEP for him that could work. So what was the point of all these meetings except to get an IEP developed that would work? That was the point of the meetings. The parents testified convincingly and without contradiction that they were trying very hard to cooperate with the district, to work with the district, to come up with a plan that could meet L.B.'s needs. They could see that the placement at the home-based day treatment program didn't work, and so they were meeting time and time again and really cooperating at every stage. I mean, filling out every release of information that they were provided, providing the discharge summary from Trails, inviting their independent evaluator to speak to the team at the April 2021 IEP meeting regarding his needs, signing the assessment plan, cooperating in the assessment. And I think it's important to note, because the record is unclear on this, that he was enrolled in the district at the time of all six IEP meetings. So parents placed him because he needed to be placed somewhere safe. He could not access his education without a therapeutic component that just wasn't available at the time they placed. But they weren't unwilling to consider other options. They weren't wed to that program alone. The district just didn't offer them any viable option. So that's different than the Capistrano case, where the parents said, we're going to put our kid in private placement for two years, and we're not going to work with you to develop an IEP. Exactly. Really, this case is the inverse of Capistrano, because in Capistrano, there was no IEP meeting. And parents were saying, you should have held an IEP meeting as an annual IEP, even though we never requested one. And even though we told you we were going to take our child out for two years and keep him in private school. Here, the parents never made any such comments, and they did go to IEP meetings. It's not that they're arguing that IEP meetings should have been held. Six IEP meetings were held over 15 months. They're just saying that in those IEP meetings, the district had an obligation to offer FAPE. And the lower court's analysis that that obligation doesn't exist at certain IEP meetings is nowhere in the law or case law. I don't know. Where do you suspect the district court came up with that requirement that you have to request an IEP document? I don't know. I think the administrative law judge said that the parents hadn't requested an IEP meeting. So we worked very hard to explain to the district court judge that they had, in fact, explicitly and constructively requested meetings. So the district court judge conceded, okay, they requested a meeting, but they didn't request an IEP document or the development of an IEP. And that's really a distinction without a difference. That kind of difference doesn't exist anywhere in the law or anything, any case law, any statutory law. So if we look at, so they did the settlement with the school district for $10,000 in May of 2020. L.B. begins attending Riley Alternative School August of 31. September 29th, there's no request for IEP. There's no request for a different program. It just says there have been some recent developments with L. He will be going to a wilderness therapy camp starting tomorrow. I want to make sure we have everything in place and everyone notified so we're all on the same page. I can be reached at this number. Does that in any way to you say let's collaborate and work on a new program to get him a FAP education? Where in that at all says I'm reaching out to you. Let's revise the IEP. Let's figure out how this is telling you he is going to wilderness therapy camp tomorrow. I'm letting you know. So everyone's on the same page. Yes, and I would say it wasn't until the day later that they did engage in that collaborative process. So the next day, the father had a long conversation with Mr. Means, the case manager, and explained part of the issue here is that L. B. Came to Riley with a long history that from the same school district. So these parents believed that Riley had read all of his history. They had signed numerous releases of information. And so they understood that when they were saying he's having trouble, he's decompensating. There was a background knowledge on the part of the Riley staff that may have not been there. So they then spent quite a bit of time after placing L. B. At trails, explaining to them what L. B.'s needs were, and then immediately requesting an IEP meeting. And I think you can make an argument. I do agree that Eric and I, the father, unilaterally placed Luke at the Wilderness Treatment Program. And then their next request is requesting funding for the placement that they have unilaterally done. Well, actually, they never even made the request. The district unilaterally denied that request before parents had even made it. But I think, you know, when you're looking at a question of reimbursement under the Supreme Court Burlington-Carter test, typically what you're doing at that last prong is weighing the equities and saying, did the parents act equitably? Did they give enough notice before placing? They're supposed to give ten days' notice. There is an exception if there's a safety issue here. I would argue there was. But, again, a judge might say, you know what, I'm not going to reimburse you until that October meeting because they just didn't have enough information. You didn't explain that to them. But, really, we never got to any of that here because these judges said that there was no entitlement to FAPE at any IEP meeting. So this letter, the March 6, 2021, letter with the plaintiff's attorney says, I refer to your letter of October 1, 2020, refusing to fund a placement for our son, L.B., and it is requesting funding. With an attorney, C.C., at, you know, paul at SDeducationsattorney.com, I guess it seems to me from looking at these e-mails is that the parents knew what they wanted to do. They thought the online education during COVID was not working and that he needed wilderness therapy and then a residential program, and that's what they were going to do. There doesn't seem anything that's saying, do you think this is the right way to get his educational needs met, his emotional needs met? This is what he's going to do. And so it just seems to me, looking at all of these e-mails, that this is requesting reimbursement after the fact. And I guess one question I have for you is we're trying to glean from all of these communications, the testimony, what was actually requested here, and that, to me, is a factual question, not a legal question. Do you agree that we're trying to parse through all the testimony of all the parties involved and all of these e-mails of what was requested? Whether it was a document or whether it was a meeting almost doesn't matter. We're trying to glean a fact. What was requested? I don't think that that actually matters. I think the fact that they held the IEP team meetings is what matters. I mean, you can say that that e-mail wasn't a request, but the very next day the school principal said, I will schedule an IEP meeting. And then they attended the IEP meetings. And what were all the IEP meetings that fall were just to get him off the rolls and disenrolled at San Diego Unified because he was getting Ds and Fs because he wasn't attending Riley? No. That's the only thing that happened during that whole fall. That's actually not true. So the reason why they sent e-mails is because they didn't want him to fail at Riley because he was actually not attending school there. If I may, Your Honor, I'd like to provide a few more facts about those meetings that I think make it very clear that they were actually held to develop an IEP for LB. So first, in preparation for the October 2020 meeting, the case manager asked parent if they would like to meet formally or informally. Parent said formally. Then the case manager sent the team an e-mail titled IEP meeting. And in that e-mail, in just the description of the meeting, said, from my conversation with the family, we need to discuss further how better to support LB, what worked and did not work in his experience at Riley. Had nothing to do with disenrollment. That was a very big surprise when we heard that from the ALJ. They asked parents to- But there are lots of e-mails about we need to get him disenrolled because he's getting Ds and Fs at Riley. Are you saying those e-mails don't exist or don't say what they say? I think Riley wanted to disenroll him, but I think that's a separate process from attending an IEP meeting. Nobody has to attend an IEP meeting to disenroll a student from school. It's like a two-minute process. They then created an IEP document- Okay, I'm looking at this November 1, 2020 e-mail from the mother. Sue, I'm not sure I understand all of this with his grades. Please, can we schedule an IEP meeting this week ASAP? Then the meeting is- Also, please let me know if you'd like to schedule another IEP to discuss- At this time, Lucas- Oh, I'm so sorry. Is enrolled full-time with us and is at risk of receiving a D or an F or two or more of his classes for non-attendance and not completing work since September 30th of 2020. Yes, you'll need to hold an IEP to discuss this as well. I understand that school districts is very loose with what they refer to as an IEP, but the whole purpose of this was to get him disenrolled so he would not be shown as failing. It's actually not true, Your Honor. Really, when you look at the records, yes, part of what they were talking about throughout these e-mails was disenrollment, but that was separate and apart from what was occurring at these IEP meetings, and you can tell that because the district's own contemporaneous notes from those IEP meetings make that very clear. So, for example, the November 5th, 2020 IEP meeting, the district's own therapist's notes, contemporaneous notes, say, IEP meeting with parents and staff to discuss progress needs current placement. So it was not a meeting to disenroll him. He then describes the November 13th meeting as the part two, and the team discussed progress towards IEP goals, services offered during COVID. So while they were meeting to attempt to develop an IEP, or at least the parents understood they were meeting to attempt to develop an IEP for L.B., there was a parallel conversation about how to disenroll L.B., but the purpose of the IEP meetings was not to disenroll him. They were IEP meetings. IEP documents were created from those meetings. IEP notes are written from the meetings. Again, they asked the parent to waive the general education teacher prior. I think I'm running low on time, and I do. Yeah, I just, what section of the act are you pointing to that entitles you to reimbursement or your client for reimbursement for the private placement? Sure. So the law from that comes from Florence County v. Carter, the Supreme Court case, and then Burlington Town. I can get you the exact site, but another Supreme Court case that articulate a three-pronged test that say that when the parent, if the parent is asking for reimbursement, they must first show that the district did not offer an appropriate placement, then show that the parent's placement was appropriate, and then they look at the equities to determine the amount of reimbursement. And there is statutory law regarding the 10-day rule and the exception for safety, and I can get that for you on rebuttal. I just don't have it in front of me. Okay, you can do that on rebuttal. And is L.B., where is L.B. currently placed? So L.B. is currently a freshman in a four-year college. He graduated from a public district high school. After returning from these programs that we argue were appropriate and necessary, he was no longer classified as emotionally disabled. He thrived in his regular public high school and has done extremely well ever since. I mean, what the parents did worked, which, you know, I think shows that the programs were appropriate. All right. Thank you, counsel. We'll hear from your friend on the other side. Okay. And I know I went over my time. May I have a bit of time for rebuttal? Yes, you can. I think the questioning took you over your time. Good morning, Your Honors. Good morning. If you may please report. My name is Jonathan Reed. I'm representing San Diego Unified School District. Counsel, I can't hear you. Okay. Is that better? If you get the mic. All right. I think both of them are live, but please let me know if you can't hear me. I think that's better. It is? Okay, good. You know, counsel presented a number of facts as unrebutted when, in fact, they were a number of facts that were rebutted and that were in dispute. The fact that, you know, when counsel said that the parents asked for placement in a residential treatment facility, district members of the IEP teams said that that did not exist, that there was no request to change the IEP, no request to develop the IEP, no request for reimbursement. It simply appeared that there was a parent who wanted to place the child in a wilderness program for a finite period of time and then come back. And the evidence did disclose that the IEPs were convened with the admittedly misunderstanding that for a special education student, in order to disenroll the student, that had to be done through the IEP process. There was also an assertion that the home-based option didn't work. But if the school district kept using the word IEP, how was the parent to know that that was not what was occurring, an actual IEP meeting for the purpose of revising an IEP? Well, IEPs can be convened for a multitude of reasons. What the law says is that an IEP is developed initially upon the initial assessment. In this case, that started in December of 2019. And then the IDEA states that the IEP team needs to convene at least annually to update the IEP with new information or any information as indicated. And so there was always an IEP here. There are quite often IEPs for various reasons, you know, changing one service. There were meetings to develop and modify the IEP to make it effective in providing a FAPE for LB. That's true. So that's what all these meetings were about, was to see if the school could develop. And maybe it just couldn't because of the requirement imposed by the state, you know, during COVID, of virtual learning. that any IEP may not have been, that the school could provide would be inadequate for an emotionally disabled child who had these issues when the learning was all virtual. Well, I should clarify, it was not the district's position that these IEP teams needed to be convened to fix an IEP or to develop something to address a need. The staff members believed that the child was in an appropriate placement. He was offered Riley School, which is a school especially designed for children with emotional difficulties. They offered mental health support. They offered behavioral support. But those services were not in place yet, right? I mean, the email that notifies the school district that LB is going to the Wilderness Program says the impetus for doing so was his behavior, which includes inability to successfully participate in school. Right. And that his one-on-one therapy had not started yet as of the time he left to placement at Wilderness. And district staff articulated and testified disagreement with that notion. There were only 21 days. This is a student who the district had not seen since 2019. He started in school. He was making progress on his goals. He was attending some classes. There was testimony that his behavior and his struggles were very similar to what other children were facing in September of 2020 when districts were implementing distance learning, often for the first time. And so the fact that he was making progress, he was on an upward trajectory, the mental health therapist said he needed to establish a rapport with the student. But district staff felt confident that they were on the right path. So he attended a local private school, San Diego Center for Children, what, the 2018-19 academic year? 2019-20. Oh, so through the fall of 2019 and the spring of 2020? Yes. And so he only, okay, that's when he went back into the public school system was August 31 of 2020. Yes, that was pursuant to the settlement agreement. So in the settlement agreement, there was a dispute over the district's offer of placement. The parents waived claims related to those IEPs developed, whether they constituted a fate, either procedurally or substantively, and agreed to bring him back at the beginning of the 2020-2021 school year. And so that lasted only 21 days. But all district staff testified consistently that he was on the right path, that he was operating in a manner very consistent with how other students, both in general education and special education, were operating at that time. Where in Capistrano does the court make any distinction between IEP documents and IEP meetings? What in Capistrano, what the court said was that essentially there's, under the plain reading of Section 1412 of the IDA, there's two classes of students. There are public school students, and under 1412, they're entitled to an IEP. And there are private school students, and under 1412, they're entitled to a proportionate share of federal funding. And in Capistrano, what the plaintiff argued was a third class, was parents who place their children privately because they dispute an offer of fate. And the Capistrano court said that the intent is irrelevant. The question is, you're either a public school student or a private school student, and you're a private school student if you're placed there. What the Ninth Circuit did in Capistrano, though, is they included a sentence that said, of course, if the parents want an IEP, all they have to do is ask, and the district has to prepare one. There's no statutory authority for that notion. And there has been opinions in the past that a bright-line rule is more consistent with the law and consistent. Doesn't that sentence actually mean IEP? You're saying that means IEP document? It could mean to prepare an IEP. It could mean that it's an IEP document if there's already an IEP prepared. It could be that a child's been in private school for a long time, and there is no active IEP document. If a child has been out of school since second grade and the child's in high school, they're not going to implement. Right, but the situation here was that parents kept meeting to get an adequate IEP in this case. They had six meetings. What's the purpose of having the meetings except to try to create a plan that will meet the child's needs? Okay, the first three meetings were for the purpose of disenrolling the student. Why does it take three meetings to disenroll a student? Because the parents would not consent to the IEPs, and so the district was trying to get them in to discuss that. And they wouldn't consent because they didn't think it was adequate? I don't know why they didn't consent to disenrollment. I don't know why they didn't consent to that. Okay, well, we'll have to find that out. But do you agree that the requirement that the district court had here that parents did not make a request for an IEP because they only requested meetings and not documents isn't the law? Well, I would say they only requested one meeting, and that was in November of 2020 when they requested the meeting to clarify the issue with respect to goals. There's no evidence that they requested another meeting, and that's a factual issue that both the administrative law judge who heard and evaluated testimony from witnesses and the district court felt and agreed that there was no request other than that one in November. But what should we make of the note of the therapist that says, this is for November 5th meeting, IEP meeting with parents and staff to discuss progress, needs, discuss current out-of-state placement? That sounds more than just disenrollment. Okay. Well, an out-of-state placement occurred, which would require the disenrollment, and I would say also just council said that the child was enrolled at all times. The parents actually affirmatively agreed to disenrollment in their last email in November. And so prior to those IEP meetings, the special education teacher had sent out a letter to all parents saying that this is how we're implementing distance learning. If you have any questions, you're welcome to discuss that either informally or through an IEP process. What is the situation here? The school district is just really sloppy with how it uses the word IEP. Is that the conclusion here? They just use it any time they meet with a parent? It's just the record here is confusing. Okay. I'll say that. And perhaps, you know, I'm not sure. I mean, an IEP is a formal meeting. And the IDEA contemplates that, you know, they need to be reviewed at least annually, but it also contemplates that IEP teams can convene throughout the year. And one of the reasons could be a change of placement or enrollment. What the administrative law judge found was that Capistrano was decided on December 31st, 2021, and so the team did not have the benefit of the guidance of Capistrano. But Capistrano's requirement that you have to request a document and not request a meeting. I mean, what the IDEA requires is that there's an individualized education program that is developed, reviewed, and revised for each child with a disability. And that's the purpose of the IEP meetings under this statute. Right. And so if the parents are attending six IEP meetings, what are they doing except trying to get an appropriate education for their kid? If the San Diego School District could have provided that, then the parents would have accepted it. But they needed a residential placement. Okay. Well, they didn't behave as if they would have requested it because they notified the district that they were enrolling in a wilderness program, not a residential placement, the following day. They did not provide the requisite 10 days notice, which in that circumstance would have given the district the opportunity to address any concerns they had prior to the placement. And so by the time they had these meetings, he was already in North Carolina, and the district was trying to prevent him from getting failing grades in high school where those credits matter. Doesn't the IDEA also require reimbursement with parents who for no reason put their child in a, maybe because they think that their child is better off in a private placement than what the school district is offering in terms of an IEP? It requires reimbursement. It has provisions for children in private schools. Yes. And they have sections for children in private schools because the district has decided, and they have a section for children in private schools because the parents have decided. And as I read the statute, they get less reimbursement if they've decided on their own to put their kid in the private school, and they get more if the district has decided. Or they might get none. Depending on, right, but not depending on whether or not they requested an IEP document. I mean, that's, they had one. So they were having meetings to develop them or evolve as the needs of the child evolved. And you have to admit, during COVID, there was a lot of additional work in making that happen. My reading of the plain language of 1412 is that consistent with Capistrano, if a child is enrolled in the district or placed by a district IEP team in a private place, they're a public school student. They have a full entitlement to an IEP. If they're placed by their parents in a private school, they're a private school student, and their only entitlement is to a proportionate share of federal funding. Right, but they're entitled to something. At the end of that- But there's some requirement as to whether the private placement is appropriate, right? There's some- No, no, the only- Even when the parent places them unilaterally? There's no- That's, any parent can place their child in private school unilaterally. There's no requirement that that has any kind of standard. So if they're either a public school student or they're placed by their parent in private school, they're a private school student. And then what Capistrano said was at the end of 1412, where they talk about parental placements where FAPE is in dispute, that doesn't mean that those- That doesn't create another class of students. That just identifies a remedy for parents if they can prove that prior to the unilateral placement, the district failed to offer FAPE, and if they proved that their private placement was appropriate, and if they provided the requisite notice. And here, both the administrative law judge and the district court found that prior to the removal, the district had offered a free appropriate public education. Part of that was the parents stipulating to that in the previous settlement agreement, but there was an affirmative finding that the district had offered a FAPE prior to the unilateral removal, and it was undisputed that there was no notice as specifically required in 1412A10C. Now, your counsel on the other side is talking about a safety exception to the 10-day notice requirement. Do you know what she's referring to? Yes. Okay. If there needs to be an emergency placement, but there were questions about that, and they simply didn't prove that that exists. It wasn't an argument that they made in the underlying briefing. So, essentially, what you had is an IEP that's working in a very similar manner to any other student, and the parents who have decided to unilaterally place the child in a wilderness program. When did the school district become aware that L.B. had been placed at Whetstone Academy? On the day of the April IEP. And was there any notice between August 31, when L.B. began attending Riley, and September 29, when the school district receives a letter that he would be starting the wilderness camp the next day? Was there any time in that period where any of the dissatisfaction with Riley was raised by the parents? I'm not aware of any communication regarding dissatisfaction. I am aware of constant communication between staff and parents to try to make this transition work. So, why shouldn't there be a bright line rule, and why shouldn't that rule put the burden on the school district so that, you know, in future cases, people are not having to divine what's in a deposition testimony and emails about what's exactly being requested? You know, if parents are not always, I mean, these parents are sophisticated and educated, but if other parents are not well-informed, not educated, why shouldn't the burden be on the school district to have, when it's more ambiguous in these situations, for the favor to be given to the parents? I'm not clear. The burden on the school district to do what? Well, we're saying, it seems like you're imposing on parents a requirement that says explicitly, I request an IEP document. You're saying, just saying, I request an IEP is not sufficient. Right. Right? So what? And so, what I would submit the bright line rule is, is that if the child is enrolled in private school, they're a private school student, and they don't get an individual entitlement to a free appropriate public education until they're enrolled in a public school program. That's the bright line. But that's what I don't understand, because under the facts here, he started at Riley in 831-20 as an eighth grader, and so he was attending Riley virtually when his parents decided to move him to the private school. Yeah, so he was a public... So he had an IEP, right? An IEP. He was a public student person with an IEP. Yes. And then they decided the thing wasn't working, and they had an emergency apparently, and they needed to enroll him somewhere else where it would work. Yes, so from August 31st until September 29th, he was a public school student. He was entitled to his IEP. Once parents placed him on September 30th in the wilderness program, he was a private school student with no individual entitlement to special education. But to some reimbursement for a proportion. Potentially the right to a remedy of reimbursement, if they can show that the district fails to... So is the only thing they're entitled to is reimbursement of the private school tuition? They don't get any other services if they're a full-time private school student? No, if you read the middle of 1412, what it says is for children who are private school students... Can you give me the section number? I have that statute. Let me see. Okay, it's 10, right? It's 10. 4A10, and I can give you the precise number. It would be 4A10-1. A-1, I believe. But what it says is what districts need to do is count the number of private school students in their jurisdiction, and then take the amount of federal funding that they receive for special education and divide that number by the amount of federal funding to determine each child's proportionate share of federal funding. And then the U.S. Department of Education has articulated that those children are entitled to services consistent with their proportionate share of federal funding under an individualized services plan, not an IEP. I want to go back to a question that Judge Koh asked, which is why shouldn't we put the burden on the school, to be clear? Isn't it incorrect to do what the district court did here, and apparently the ALJ, and place the burden on the parents? No matter how sophisticated they allegedly are given, this is my little wrinkle on this, because I've studied this statute over and over and over, and it's difficult. I mean, it's a very sophisticated, complicated statute with a lot of different provisions, and you almost need a special expertise to understand how all the pieces work. And given that, and given that the school districts have to deal with it almost on a daily basis, and parents do not, and also the goal of the IDEA to have full parent participation, why shouldn't the burden be on the school district to say, well, what do you want us to do here? Do you want us to continue revising the IEP? Why are we having six meetings? Because districts are obligated to consider the input of the parents in the IEP process, but ultimately they owe a duty to the child to offer what they believe to be a free, appropriate public education in the least restrictive environment. Now you just added another wrinkle, layer of complexity to this statute. You're right. In the least restrictive environment is correct. But I believe that 1412 is simple, and Capistrano recognized that it is simple, that there's two classes of students, public school students and private school students. Where the lack of a bright line exists is from that one statement in Capistrano that was cited without authority that says all the parents have to do is request an IEP. We should take Capistrano en banc to delete the one sentence. I would submit that even if there was statutory authority for that statement, there is nothing difficult about requesting an IEP meeting, requesting a change, requesting something. And typically that request will end with a question mark. They requested meetings, or the school requested meetings, or somebody requested something. The district scheduled meetings in October and November, and the one in November was following the parents' email asking to discuss grades. The meeting in April was following their submission of an independent educational evaluation, and there is a separate requirement also listed in two separate places of 1412 that's called child find, where districts have to identify, locate, and evaluate students. That doesn't mean that they have to develop an IEP for them. They just have to continue to put out feelers to see if children are there and to continue to evaluate them if they qualify. Sorry, I just want a clarification. If you're a child who's in private school placed by your parents and not by the school district, the purpose of IEPs at that point are what? To determine the amount of reimbursement of federal funding and potentially a reintegration back into public school. What is the purpose of the IEPs in that situation where a parent unilaterally places their child in private school? Well, had Capistrano existed, there likely would not have been IEP meetings because the parents had not requested one. If the parents were to request an IEP, what the Department of Education said is it would be to make a FAPE available. And so that may be talking about the IEP that exists, but the actual entitlement to special education-related services under the plain language of the statute is based on whether the child's in public school or whether the child's in private school. So there is ambiguity. There's three categories. No, there's two categories. No, there's three. Oh, well, you're saying if they're placed in private school as a result of the... I'm just thinking of the recent Loffman opinion I wrote. Going through all the statutory, it seems to me there were three categories. Well, one might be private school placed by parents, one might be private school placed by school district, and third is like public school student. And I would collapse private school students placed by school districts into the class of public school students. That's just the placement that they've offered through the IEP. All right. Does anyone? Judge Gold, do you have any questions? Okay. No, thank you. Okay. All right. Thank you very much, counsel. You're welcome. Ms. Nunez. Thank you, Your Honors. I do want to clarify the law a little bit because what 1412 is saying is that if you are in a private school, you don't get special education services from your school district. That's been clear for a very long time. It is not saying that if you're enrolled in private school, you can't go to your district of residence and request an offer of FAPE. And that's done all the time. So a kid who goes to the Catholic school down their street suspects dyslexia. They go to their local school. Their local school evaluates and produces an IEP. The child does not have to enroll in order to get that offer. Now, in order to access the offer, yes, the child would have to go to the school and enroll. But there has always been a right for a child, and there's a lot of law, and I was just trying to find the citation, but out of this court that says it is residency, not enrollment, that provides that right to an offer of FAPE. So it's, I think, very important to understand that even private school students are entitled to an offer of FAPE. They can go to their school and see what's available for them in the public school system. And that is what the parents were doing here. What should we think about the language in Capistrano which says, we hold that if the student has been enrolled in private school by her parents, then the district need not prepare an IEP, even if a claim for reimbursement has been filed. To be sure, when parents withdraw a student from public school and place her in private school, all they have to do is ask for an IEP, and then the district must prepare one. It does seem to support a document versus meeting distinction, which we make of that language. I don't think that's what they meant. I mean, there's really no distinction in the statute at all. And what I think Capistrano was saying, so prior to Capistrano, the common wisdom was that there were these three categories of students. The ones who had been privately placed never to return, those who had been privately placed with a request, an active request for reimbursement, and those who either went to public school or were placed by the public school system. And there was a belief that if you were in the category of people who were asking for reimbursement, that the district continued to have a freestanding obligation to offer FAPE on an annual basis, just like it would if you were in the private school. And Capistrano said no. You took your kid out of school, you know, in that case said they'd be gone for two years, and now you're upset because we didn't call you to schedule an annual IEP meeting when you weren't planning to even come back. There's no freestanding obligation for your school of residence to continue to have IEP meetings just because the law requires them annually. Especially if you have left to a private school, even though you've told them you want reimbursement. I guess in this situation where the parents unilaterally take L.B. out of Riley without telling the school until the day before, and he's already flown to North Carolina, and then doesn't tell the school that he switched out to a different school in December until March, I guess I'm not clear on how the school thought he definitely wants to come back this year. I mean, if you don't even tell the school district where L.B. is from the end of December until April, how is the school supposed to know that actually the parents want L.B. back in the home and want L.B. attending online school from home? I'm not sure that's clear. That's not what the parents wanted. They did not want him to come home and return to that program. It sounds like they didn't want him at home, period, right?  And he doesn't have to come home for the district to make an offer. Because the one time he came home, even when he was at the wilderness camp, he had a meltdown. That's what's in the record. So there was a lot of things going on within the family that exacerbated some of his emotional... Well, I would say...  He had a lot of mental health issues. But I think what's really important to focus on is that November 13th, 2020 meeting. Because the parents went to that meeting and said, look, TRAILS is about to end. We've all known it's a 90-day program. They are recommending not that L.B. come home, but that he continue to a residential placement. Now, at that time, the school district has not only the option but the obligation to consider the full continuum of services, including residential placement. But the IEP team didn't do any of that. They just gave them the same cut-and-pasted IEP from December of 2019. So the parents... They didn't even know. They didn't have information from what kind of services he was getting at therapy. So it's a little bit hard to say, oh, you should have been inputting this information when they didn't even know what school he was at. They didn't know what services he was getting. At this time, they did. In November of 2020, they knew he was at TRAILS. Parents had given them all information they wanted. They had attended an October and a November 5th IEP meeting to discuss... They signed a lot of releases, too, so that they could get information. At that point, I don't know whether the district had asked them to sign the releases yet. But as soon as the district sent them the releases of information, they immediately signed them and returned them. So at that November meeting, the district knew he's at TRAILS. They knew he has... Is there anything in the record why he didn't go to a program that was closer to San Diego? Why he had to go all the way to North and South Carolina for these private programs? I don't recall. Or there's nothing in the record? I don't recall if it's on the record. But this was during COVID, and most places were not accepting new students at that time. South Carolina did have a much more lenient return-to-school program than California. So I believe that that was why. But I don't recall if that was... There's nothing in the record on that?  I don't think so. But I do want to... I don't want you to speculate. Thank you. Oh, sure. But just... It's important maybe to note that the California Department of Education does contract with many, many residential treatment centers outside of the state of California. And that's because California can't keep students against their will. So it's really common, actually, for kids to go to other states. It's not more costly, typically, or anything like that. That's also my Laughlin opinion about where California sends a lot of the kids to some pretty crazy schools. If I may, if I have enough time, I wanted to just kind of summarize something that I think may have been missed, which is that we're not asking this court in any way to say whether the district offered L.B. FAPE. We are asking that the district just say that the district had an obligation to offer him FAPE, so that we can litigate that in the lower court, which is much closer to the facts. And the reason that the district court found that the school district did not have an obligation to offer FAPE is because the parents did not request a document. It seems to be that, yes. So what role would you prefer to see? That participation in the IEP meetings is tantamount to a request for the FAPE? What I think happened is that the courts got a little bit tangled up in the precise language used in Capistrano. When Capistrano said all a parent in a private school needs to do is request an IEP and they can create one, what they were saying was as long as they make it clear they want to come back to the table and get an offer, then of course you have to make an offer. So I don't know that we need to parse exactly how that request is made. I think if you've made it to the IEP meeting, it's pretty clear you're requesting to participate in the IEP process, and then all those rights that are given to any person who attends an IEP meeting should remain. Okay. Well, I think we've gone over time on both sides of this. Thank you very much, Your Honors. Thank you very much. Do you want to take a few-minute break before we take up the next case? Sure. Okay. We're going to be in recess for about five minutes. Thank you both for a very excellent argument and educational one as well. Thank you.
judges: WARDLAW, GOULD, KOH